

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00291-CV

_____

IN THE INTEREST OF T.C., A CHILD

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. D2018046

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

After a bench trial, the trial court terminated Mother's parental rights to her son Adam[1] after finding four grounds:

- dangerous conditions or surroundings; Tex. Fam. Code Ann. § 161.001(b)(1)(D);

- dangerous conduct; *id.* § 161.001(b)(1)(E);

- constructive abandonment; *id.* § 161.001(b)(1)(N);

- failure to comply with a court order; *id.* § 161.001(b)(1)(O);

and that termination was in Adam's best interest. *Id.* § 161.001(b)(2).[2] On appeal, Mother attacks the legal and factual evidentiary sufficiency supporting all five findings. We affirm.

## Standard of Review

### A. Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

---

[1]We use the alias "Adam" to identify the child and refer to his family members by their relation to him. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The trial court terminated Father's parental rights too, but he has not appealed.

Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds (currently up to 21) that are listed in Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest under Section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

Regarding subsection 161.001(b)(1) grounds, the supreme court recently articulated an important qualification: if the trial court finds grounds under subsection (b)(1)(D) or (E)—and an appellant challenges either the (D) or (E) grounds, both of

3

which involve endangering a child's physical or emotional well-being—an appellate court must review the (D) or (E) grounds on appeal because they have potential collateral consequences for other children the parent may have. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing that a prior termination under (D) or (E) is a ground for terminating parental rights to a different child); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) ("[I]f a court of appeals affirms the termination on either [(D) or (E)] grounds, it must provide the details of its analysis.").[3] Termination may not be based solely on the child's best interest as determined by the factfinder under section 161.001(b)(2). *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

---

[3]In that case, the trial court found grounds under (D), (E), and (O); on appeal, the court affirmed on (O) and declined to address (D) and (E). *N.G.*, 577 S.W.3d at 233. The supreme court held that the appellate court erred by not addressing grounds (D) or (E) and also erred in its (O) analysis and remanded the case on all three grounds to the appellate court for "further proceedings consistent with this opinion." *Id.* at 237, 239 ("We hold that due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under [S]ection 161.001(b)(1)(D) or (E) of the Family Code."). We read *N.G.* to say that an affirmance under either (D) *or* (E) suffices because under (M) an affirmance under one makes the other moot. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing that a prior termination under (D) or (E) is a ground for terminating parental rights to a different child); *In re P.W.*, 579 S.W.3d 713, 728 (Tex. App.—Houston [14th Dist.] 2019 no pet.) (affirming on (E) and not addressing (D)). Regardless of how to interpret the disjunctive, out of an abundance of caution we will address both (D) and (E) grounds. We note that on remand the appellate court in *N.G.* affirmed on (D) and (E) grounds and declined to address the (O) ground. *See In re N.G.*, No. 05-17-01255-CV, 2019 WL 4126496, at *7 (Tex. App.—Dallas Aug. 30, 2019, pet. denied) (mem. op.).

## B. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department of Family and Protective Services proved both the particular ground for termination and that termination was in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor; that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

## C. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency

5

review, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## The Evidence

### A. The Department learns that Mother is using drugs and places Adam with Uncle.

Law enforcement made a welfare check on Mother's residence in September 2017 and found her under the influence of some substance. When questioned, Mother admitted having used methamphetamines two days earlier.

On the same date, the Department received an intake alleging child abuse or neglect. Based on Mother's admission during the welfare check, the Department created a safety plan for Adam. What concerned the Department was Mother's methamphetamine use and her ability to watch Adam.

Leaving a child with someone using methamphetamines was dangerous; a Department investigator testified,

6

They can be—the supervision can be neglected after extensive use of methamphetamines whenever they go into increasing amounts of sleep. Sexual abuse has been known to occur because of a—an extensive sexual drive that methamphetamines has been known to create as well. Exposure is one of the biggest risks. Exposing a kiddo to methamphetamines—or, excuse me, a child, can—exposing them in their—while they're developing to methamphetamines can impact their development and growth.

The Department wanted Adam placed somewhere safe—somewhere other than with Mother. Adam's father was incarcerated in Kentucky and was thus not a placement option. Placement with Grandmother and Stepgrandfather was not an option either because Mother lived with them.

Ultimately, Mother signed a document authorizing the Department to place Adam with Uncle. As part of the plan, Mother could have no unsupervised contact with Adam and could visit him once a week when Uncle and his wife were available.

The next day, the Department received a second intake based on allegations that Adam was shaking at school and was filthy. He also had issues with toilet training and his speech. Adam was six years old at the time.

## B. The Department learns about Mother's bipolar diagnosis and enters a new safety plan.

At some point, Mother disclosed that she had been diagnosed as bipolar with cannabis and stimulant use. So, in addition to her drug use, the Department had concerns about Mother's mental health and her failure to take her medications. In response to these new concerns, Mother checked herself into Mesa Springs, a psychiatric hospital, in October 2017.

Later that same month, the Department created a second safety plan that addressed Mother's mental health issue in addition to her drug use. As before, Adam was to stay with Uncle, and Mother was to have no unsupervised contact.

## C. The Department moves Mother's case to Family Based Safety Services.

Terry Johnson of Family Based Safety Services (FBSS),[4] Investigator Kelsey Jordan, Mother, and Grandmother had a "joint visit" in early December 2017. A "joint visit" occurs when the Department transfers a case from an investigation status to FBSS.

When asked to describe Mother's behavior during the joint visit, Johnson responded:

> She was very fidgety and shaky. She couldn't stay on—she couldn't track anything that we were talking about. She left the room a couple of times and brought back boxes of documents that she wanted to show me. At one point she was talking about how she had had issues with her back. She turned around, pulled her shirt up over her head so I could see it while she bent over, which was not a normal behavior.

In short, "She was unfocused." Johnson also saw scabbing on Mother's arms and described Mother as having bad teeth and being very thin. These observations led Johnson to conclude, "In my opinion she was actively using at that time. I believe she was high at that time."

After the meeting, Mother went to have a hair-strand test, and the test results came back positive for methamphetamines and amphetamines. Mother's

---

[4] *See* Tex. Fam. Code Ann. § 264.204 (addressing services for less serious cases).

8

methamphetamine levels were 4,776—a level that indicated to Johnson that Mother frequently used methamphetamines.

**D. Mother moves to Florida.**

Within two weeks of the joint visit in early December 2017, Mother disappeared. Grandmother's understanding was that Mother had gone to Florida.

Although Mother had physically vanished, she would leave voicemails for Johnson. In February 2018, Mother left one in which she sounded lucid and stated that she was working. In the voicemail, Mother indicated that she was in Florida but said nothing about returning to Texas.

Locating Mother in Florida proved difficult. Mother never gave Johnson a valid Florida address. Mother gave Johnson one address, but when he asked the Florida sheriffs to do a welfare check, the results left him stymied.

In later conversations that Johnson had with Mother, she stated that she was not planning on returning to Texas because she believed that Grandmother had hired hit men to kill her. Johnson thought that Mother was paranoid, a frequent characteristic of methamphetamine use according to him.

Describing other conversations with Mother, Johnson said that she was "[u]nfocused" and "[a]ngry." Communicating with Mother was challenging: "She was very tangential. We couldn't hold a conversation. If I tried to speak to her about something, she would just get loud and talk over me, just rambling." Johnson was concerned that she was using methamphetamines.

Meanwhile, back in Texas, after Adam had been placed with Uncle, Johnson noticed positive changes in Adam: "He . . . became potty-trained. He started to lose weight because he was on a schedule and on a decent diet with his uncle. His speech improved. The school had . . . nothing but good to say about how he was doing. He was a whole different child."

## E. Adam's placement with Uncle breaks down.

But the safety placement with Uncle broke down. Uncle's wife was nearing the end of her pregnancy and had developed complications, so Uncle's time was consumed shuttling back and forth to the hospital.

Uncle wanted Adam placed in respite care and suggested placing him with Grandmother. Because both Mother and Adam had previously lived with Grandmother and Stepgrandfather, Adam had a close relationship with them. When the Department initially learned of Mother's drug use and sought a safe placement for Adam, it did not want Adam placed with Grandmother and Stepgrandfather because Mother was living with them and because the Department did not want Mother and Adam living in the same home. But with Mother in Florida, her presence in their home was no longer an impediment. Uncle proceeded with placing Adam with Grandmother and Stepgrandfather, but gradually Uncle stopped coming to see Adam, and Adam's placement with Uncle effectively ended. At that time, the Department had no concerns about Adam's staying with Grandmother and Stepgrandfather.

**F. Adam's respite placement with Grandmother and Stepgrandfather presents new dangers for Adam.**

From interacting with Grandmother, Johnson had not suspected that anything was wrong, but in February 2018, Father wrote Johnson, asked that Adam be placed with Adam's paternal grandfather, and expressed concerns about Grandmother's using methamphetamines, which Father asserted that he had personally witnessed. Father's letter was the first that Johnson had heard of Grandmother's purportedly using drugs, and Johnson hesitated to believe Father, who was in prison, so the Department did not remove Adam immediately.

But then Mother started calling Johnson and alleging that Grandmother was using methamphetamines and that Stepgrandfather had sexually abused Mother. Johnson spoke to Uncle about the allegations, but Uncle dismissed them as untrue. Persisting, Johnson went to speak to Grandmother.

Based on Johnson's concerns, CPS investigator Aundrea Peacock[5] accompanied him to Grandmother's home, and Peacock persuaded Grandmother to take an oral swab test. The results were positive for amphetamines and methamphetamines.[6] At the Children's Advocacy Center, when Johnson informed

---

[5]When testifying, she was identified as Aundrea Araujo.

[6]The removal affidavit states that Adam was forensically screened for sexual abuse but made no outcry.

Grandmother of the results and told her that Adam would not be returning home with her, Grandmother responded, "Well, then you fucking take him."

Adam now needed a new placement. No other family members were available; Uncle now had a baby, and his family was still battling medical issues.

## G. The Department removes Adam from Grandmother.

The Department petitioned the court in early March 2018 for an emergency removal and termination. The trial court appointed the Department as Adam's sole temporary managing conservator and appointed Mother and Father as possessory conservators.

When Peacock tried to explain the removal to Mother, Peacock could not do so without interruptions, and Peacock found communicating with Mother problematic: "Her . . . speech was very erratic[,] and sometimes it was very hard to understand her. She would switch from subject to subject, kind of rabbit-holing, very hard to hold a conversation with."

Mother left Johnson a voicemail in early March 2018. In it, Johnson thought Mother's voice exhibited paranoia, and he agreed that it was "dramatically different" from the tone she had used in her February 2018 voicemail. Johnson suspected that Mother was still using drugs. After listening to voicemails that Mother had left Peacock, Peacock too was concerned that Mother was still using methamphetamines.

Upon learning of Adam's removal, Mother said that she would rent a car and return to Texas, but she never did.

After the Department removed Adam from Grandmother, the Department gave him a hair-strand test that came back positive for methamphetamines.

Johnson recalled Mother's telling him that Grandmother had made her take methamphetamines to control her and that Grandmother would let Stepgrandfather physically and sexually abuse her. Despite Mother's serious allegations against both Grandmother and Stepgrandfather, Johnson noted that both Mother and Adam had been living with them in September 2017 and apparently had been for at least a year.

## H. The conservatorship worker testifies.

Sara Masterson worked for the Department and was Adam's conservatorship worker.

### 1. Mother engaged in dangerous conduct and left Adam in dangerous surroundings.

As a caseworker, Masterson had taken courses on how to identify child abuse and neglect and on how to identify people who were under the influence of methamphetamines and other illegal drugs. Masterson's training led her to believe that Mother was still using methamphetamines: "To me through the training that I've received, it sounds like [Mother] has slurred speech and rapid and erratic speech. She goes from subject to subject, so it tends to make me believe that she's continuing to use methamphetamine[s]." Mother also appeared paranoid and suspicious because Mother stated that she thought that her attorney "was in on this." Mother stated that

she was not going to take any drug tests and that she had no intentions of returning to Texas.

Masterson believed that Mother endangered Adam's physical or emotional well-being by using methamphetamines while she possessed him and by living with Grandmother, who was also using methamphetamines. The signs that Adam was suffering, Masterson agreed, were observable. Masterson determined that Mother and Adam appeared to have been living with Grandmother since at least 2012 because in that year, Father was adjudicated as Adam's father, and at that time, Mother had claimed the same address as she claimed in September 2017—that is, Grandmother's address.

### 2. Masterson never had a valid address for Mother, and since Mother announced that she was moving from Florida to Kansas, Masterson no longer had phone contact with her.

Once when Masterson spoke with Mother by phone, Mother stated that she was in Florida and gave Masterson an address, but when Masterson sent mail there, the mail came back as undeliverable. When Masterson confronted Mother about the false address, Mother denied ever having given it to anyone at the Department. Mother's failure to remember their conversation concerned Masterson.

On another occasion, Mother reported that she was living in a shelter but would not tell Masterson the shelter's name. Masterson spoke with Mother at least once a month; each time Masterson would ask Mother for an address, but each time Mother would not give her one.

14

One time, Mother sent Masterson a photo of a house that Mother said that she was going to buy. But Mother never followed up in any manner, and Mother never sent Masterson a picture with Mother inside the house. In early June 2019, Mother informed Masterson that Mother was moving to Kansas; because of that move, Masterson assumed that purchasing the house was off.

While Mother was purportedly in Florida, a special investigator for the Department tried to locate her. He too was not able to come up with an address.

Masterson last spoke with Mother in June 2019; Masterson's later attempts to contact Mother failed. (The termination trial was on July 31, 2019.) Since Mother left for Kansas, Masterson had tried phoning her, but Mother's phone no longer accepted calls, so Masterson resorted to email.

Because Mother had told Masterson that she was not coming back, Masterson believed that Mother had abandoned Adam.

### 3. Other than phone calls that Masterson initiated, Mother had no interaction with Adam.

Mother never visited Adam, but Mother did speak with him over the phone once a month when Masterson went to see Adam. During the visits, Masterson would call Mother so that Mother could talk with Adam. The phone conversations generally lasted about eight minutes. Masterson did not consider Mother's telephone calls to be significant.

And Mother never sent Adam any letters, any money, or any gifts. On Adam's birthday, Mother said that she was going to send him a red monster truck, but she never did. When Adam asked Mother about the red monster truck during their next phone conversation, Mother assured him that it was on its way. The gift never arrived. Mother's conduct saddened and disappointed Adam.

### 4. Mother took none of the ten drug tests that Masterson requested.

Masterson requested that Mother take drug tests on ten occasions from May 2018 through July 2019, but Mother never took any of them. Masterson explained that when a parent fails to show up for a drug test, the Department presumes positive results.

### 5. Mother completed none of her services—services that the evidence showed she needed.

Mother had not completed any of her services. Because Mother was not able to complete her service plan, Masterson asserted that this raised concerns about Mother's ability to meet Adam's needs:

> Basically, that affects her ability to just—to take care of [Adam's] needs. If she is not able to fulfill a service plan and meet her own appointments that address[] her own needs, the Department has concerns that she would not be able to meet appointments for [Adam] or get him to school every day and . . . that [Adam] would not [be] able to thrive and have all of his needs met in her care.

While Adam was in Mother's care, he was missing school, and although he was six years old, he was not yet potty-trained.

16

**6. Because Adam had been diagnosed with a genetic disorder, he needed someone he could count on to make medical appointments.**

While in care, Adam was diagnosed with a genetic disorder called chorea, which caused his hands to tremble. For a child with a genetic disorder, Masterson stated that attending medical appointments was extremely important.

**7. Since Adam's removal, he has continued to make progress and has found a home.**

Since Adam's removal, Masterson said that Adam had progressed:

[Adam] has grown academically. He's grown emotionally, mentally. He seems very well adjusted and happy. He has—when he first came into care when he was placed in his first foster placement, he did lose weight because he was on a regularly scheduled meal plan where he would eat breakfast and snacks and not just be eating any time of the day. He's been able to experience routine and consistency, and he just seems happy.

Adam liked his current placement and stated that he did not want to be moved ever again. His current placement wanted to adopt him.

**8. Any bond that Adam had with Mother has atrophied.**

Adam did not ask about Mother and had not expressed any desire to go back to her.

**I. Adam's guardian ad litem speaks well of Adam's current placement and states that it is adoption motivated.**

Teresa McGonagill was appointed as Adam's guardian ad litem. She was the second person to be so appointed, and while she was his guardian, he had been in four placements.

But in his current placement, Adam was doing very well. Adam had been there less than a month, so McGonagill described bonding questions as premature, but she added that "he seemed brighter, happier, [and] very much at ease." Adam's foster mother was interested in adopting him.

## Grounds under (D) and (E)

### A. Law

"Endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The parent's conduct need not be directed at the child nor must the child actually suffer injury in order to be endangered within the statute's meaning. *J.T.G.*, 121 S.W.3d at 125. Moreover, a child can be endangered simply by violence that is directed toward another child in the home. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Under (D), we examine evidence related to the child's environment to determine if that environment endangered the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. A parent's conduct in the home, including abusive or violent conduct, can create an environment endangering a child's physical and emotional well-being. *Id.*

Under (E), we ask whether evidence exists that the parent's conduct—including acts, omissions, or failures to act—endangered the child's physical or

18

emotional well-being. *Id.* Additionally, (E) requires not just a single act or omission but rather a voluntary, deliberate, and conscious course of conduct. *Id.*

We may conduct a consolidated review of (D) and (E) grounds when the evidence pertaining to both is interrelated, as it is here. *See In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *In re A.B.-G.*, No. 02-19-00066-CV, 2019 WL 3755770, at *8 (Tex. App.—Fort Worth Aug. 8, 2019, pet. denied) (mem. op.).

## B. Discussion

The record shows that Mother engaged in conduct that endangered Adam's physical and emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Mother used methamphetamines while having Adam in her possession, and testimony showed that using methamphetamine increased the risks for

- negligent supervision because users need increasing amounts of sleep,

- sexual abuse because methamphetamines have been known to increase sexual drives, and

- exposing the child to methamphetamines and adversely impacting his development and growth.

Test results showed that she was a frequent user. Because using illegal drugs might impair a parent or result in the parent's imprisonment, drug use may support a finding that the parent's conduct endangered the child under (E). *See In re L.E.S.*, 471 S.W.3d 915, 924 (Tex. App.—Texarkana 2015, no pet.).

19

Here, one day after the Department initiated the safety plan, the Department received a second intake alleging that Adam was shaking (which was later determined to be related to a genetic disorder), that Adam was filthy, that he had toilet-training issues despite being six years old, and that he had speech issues.[7] The common denominator is parental neglect: Adam's lack of hygiene and deficient toilet-training showed that no one was properly parenting him, and Adam's shaking and speech showed that he had health issues that no one was addressing. Drug use and its effect on a parent's life and ability to parent may establish an endangering course of conduct under (E). *Id.* (quoting *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.)).

And because Adam lived with Mother, Grandmother, and Stepgrandfather, Mother also created conditions or surroundings that endangered Adam's physical and emotional well-being. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(D). We have already discussed how Mother's conduct endangered Adam. As for Grandmother, Mother accused her of giving Mother methamphetamines to better control Mother. Mother also alleged that Grandmother herself used methamphetamines; after the Department investigated Mother's accusation, the Department confirmed that it was true—Grandmother was using

---

[7]Presumably Uncle had an opportunity to clean Adam up. But contextually Adam's dirty condition was being attributed to Mother, although it is not clear why. Regardless, Adam had other issues that Uncle, having had Adam only one day, had no control over.

methamphetamines. And Mother accused Stepgrandfather of sexually abusing her. If true, that raised questions about Stepgrandfather. (We note that Mother had also accused Grandmother of hiring hit men to kill her, which a factfinder might venture to question.) And if not true, that raised concerns about Mother's paranoia. Either option placed Adam in a dangerous environment but for different reasons. Any doubts about whether Adam was living in a dangerous environment while living with Grandmother were removed when Adam tested positive for methamphetamines after the Department removed him from her home. In short, Mother was aware that remaining in Grandmother's home was dangerous, but she and Adam remained there—apparently for years. A parent's illegal drug use supports the conclusion that a child's surroundings endanger the child's physical or emotional well-being. *See L.E.S.*, 471 S.W.3d at 925. And a child is endangered when the environment creates a potential danger for the child that the parent is aware of but disregards. *See id.*

We hold that the evidence sufficed both legally and factually to support the trial court's (D) and (E) findings. *See J.F.C.*, 96 S.W.3d at 265–66 (stating that to be legally sufficient, the evidence must be such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations); *C.H.*, 89 S.W.3d at 25 (stating that to be factually sufficient, on the entire record, a factfinder must be able to reasonably form a firm conviction or belief that the parent violated an alleged ground). We overrule Mother's legal- and factual-sufficiency challenges (her third and fourth issues) to the trial court's (D) and (E) findings.

21

## Other Grounds

Having found the evidence legally and factually sufficient under (D) and (E), we need not address grounds under (N) and (O). *See N.G.*, 577 S.W.3d at 237 n.1; *E.N.C.*, 384 S.W.3d at 803. We thus overrule Mother's first and second issues challenging the legal and factual evidentiary sufficiency to support the trial court's (N) and (O) findings as moot. *See* Tex. R. App. P. 47.1.

## Best Interest

### A. Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative both on grounds under Section 161.001(b)(1) and on best interest under Section 161.001(b)(2). *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the factfinder in a termination case may also use in determining the child's best interest include:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

22

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *A.B.-G.*, 2019 WL 3755770, at \*9; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at \*4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

## B. Discussion

This case started because Mother was using methamphetamines while parenting Adam. The evidence strongly supported Mother's continued methamphetamine use, and no evidence suggested the contrary.

Complicating the parenting issues was Mother's disclosure that she had been diagnosed as bipolar and the Department's concern that Mother was not taking her medications. Although Mother entered a psychiatric hospital, she thereafter left the

23

state for parts unknown (presumably Florida) and could not be located for the duration of the proceedings. Her erratic and paranoid behavior continued; nothing suggested that she was taking any medications to address her bipolar condition.

Other than brief monthly phone calls that Masterson—not Mother—initiated, Mother had no contact with Adam from December 2017 until July 2019. She did not even appear for trial.

Mother's actions speak clearly: she has no intention of parenting Adam.

For his part, Adam expressed no interest in returning to Mother.

By Mother's conduct, she abdicated nearly all her parental responsibilities. (Her warning the Department that Grandmother used methamphetamines deserves some recognition.) In contrast, Adam's foster mother wanted to adopt him and assume parental responsibility for him.

The Department made efforts to place Adam with family members, but the placements failed.[8] Adam had now found a home that he wanted to stay in and a family that wanted to adopt him.

We hold that the evidence suffices both legally and factually to support the trial court's best-interest finding. *See J.F.C.*, 96 S.W.3d at 265–66 (stating the test for legal sufficiency); *C.H.*, 89 S.W.3d at 25 (stating the test for factual sufficiency); *Holley*,

---

[8]In addition to the placement with Uncle and Grandmother's respite care, a placement with Paternal Aunt failed.

544 S.W.2d at 371–72 (listing best-interest factors). We overrule Mother's legal- and factual-sufficiency challenges (her fifth issue) to the trial court's best-interest finding.

## Conclusion

Having overruled Mother's issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  December 5, 2019